In the Matter of RONRICO CORPORATION, Debtor.

Bankr. No. 2146.

United States District Court
D. Puerto Rico.

April 8, 1958.

See also 1 Cir., 211 F.2d 727.

Gabriel de la Haba, San Juan, P. R., for trustee.

H. S. McConnell, San Juan, P. R., for Puerto Rico Distilling Co.

Juan Pedrosa, Dept. of Justice, Commonwealth of P. R., San Juan, P. R., for Treasury of the Commonwealth of Puerto Rico.

J. E. Darlington, Hammond, Ind., for R. E. Peckham.

Jorge L. Cordova, San Juan, P. R., for the debtor.

Thomas H. Anderson, Anderson and Nadeau, Miami, Fla., Cesar A. Montilla, and Luis F. Cuyar, San Juan, P. R., for Ferd S. Meyer and Ferd S. Meyer Puerto Rican Trust.

**RUIZ-NAZARIO, District Judge.**

This is a proceeding under the provisions of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., initiated by the debtor, Ronrico Corporation (hereinafter called "Ronrico") on April 6, 1956. On that same date, a Trustee was appointed by this court, and a hearing was set for May 18, 1956 to consider any relevant matters that might be brought to the attention of the court. At the hearing on May 18, 1956, no objections were made by any interested party, either to the order approving the petition of the debtor, to the appointment of the trustee, or to any other relevant matter.

The Trustee so appointed has continued to operate the business of the debtor, since his appointment, and up to the present time, relying principally upon a production and financing arrangement with Puerto Rico Distilling Company (hereinafter called "Distilling"), which was approved by the court.

The reasons which impelled the debtor to invoke the jurisdiction of this court under the provisions of Chapter X of the Bankruptcy Act are set forth at length in the debtor's petition, in which the debtor alleges in substance that it is unable to meet its obligations as they mature, and that it has been prevented by a conflict between its stockholders from obtaining additional risk capital which it urgently needs. The debtor had substantial earnings during the war years, between 1941 and 1946, and paid out approximately $2,600,000 in dividends and royalties to its stockholders during the period. In 1947 the market for the debtor's product collapsed, and debtor's sales of rum in the market in Continental United States dropped from 239,024 cases in 1946 to 21,321 cases in 1947. As a result the debtor found itself heavily indebted to banks and others, without other means for payment except through a liquidation of its stocks of aged rum.

The stockholders of the debtor made various efforts to meet the situation, apparently in the hope that the difficulties in which the debtor found itself in 1947 would be temporary. In 1947 the debtor raised an additional $250,000 in capital by the issuance of its preferred stock for that amount to its stockholders.

The debtor's situation did not improve, and the additional capital provided by the preferred stock issue was insufficient to meet the debtor's problems. A second effort was made, late in 1947, to provide the debtor with further funds, in the form of a mortgage loan from Distilling in the amount of $100,000.

This also proved insufficient, and a third effort was made on July 14, 1948, when the two principal stockholders of

the debtor (Puerto Rico Distilling Company and the Ferd S. Meyer Puerto Rican Trust) entered into an agreement (sometimes called the "Agreement of July 14, 1948"), by which Distilling undertook and agreed to make such loans to the debtor as the latter might require for a period of one year, but not in excess of $150,000. As security for the repayment of these loans, the debtor assigned to Distilling its trademarks and the business and good will of the business appurtenant thereto; and turned the management of its business and affairs over to an Executive Committee of the debtor's Board of Directors. Three members of the Executive Committee were nominees of Distilling; and two, nominees of the Ferd S. Meyer Puerto Rican Trust.

The $150,000 originally provided in the Agreement of July 14, 1948 also proved insufficient for the debtor's needs, and, without further formal agreement, Distilling continued its advances under the Agreement of July 14, 1948, until on April 6, 1956, the total amount owing by the debtor to Distilling by reason of loans and advances made under the Agreement aggregated $370,304.33.

A still further effort was made to solve the problems of the debtor on March 11, 1952, when Distilling purchased from the debtor its stocks of aged rum and the barrels containing the same for $530,111.31, which was in effect used to pay off the remaining balance owing by the debtor to the banks, and to reduce the indebtedness of the debtor to Distilling.

As was permitted under the Agreement of July 14, 1948, Distilling, as of September 1, 1952, took over the production and sale of the debtor's products, which it continued, except for a short period, up to the date of the appointment of the Trustee in this proceeding.

The debtor made one final effort to refinance itself at a meeting of its Board of Directors on January 18, 1956, at which the Board proposed, subject to approval of the stockholders, to accept an offer to Distilling to subscribe for not more than 44,500 shares of common stock of the debtor, at a price of $16.80 per share, upon condition, however, that Distilling should acquire not less than 35,000 shares of the new issue.

Ferd S. Meyer, as Trustee of the Ferd S. Meyer Puerto Rican Trust, countered this effort of the Board of Directors of the debtor by a stockholders' suit in the Chancery Court of Delaware; and as a result of the filing of this suit, Distilling withdrew its offer to purchase shares of the debtor, and the Board of Directors of the debtor filed the debtor's petition which initiated this proceeding.

The debtor's efforts to refinance itself were further complicated by other factors. The debtor was conceived of initially as a sort of corporate partnership between Distilling and Florida Cane Products Corporation (later substituted by the Ferd S. Meyer Puerto Rican Trust), for the purpose of marketing the products of Distilling, principally rum under the trademark "Ronrico". Voting trust agreements were set up in which control of the debtor was shared equally by the two groups of stockholders, who were equally represented on the Board of Directors, and equally represented in management by two officers called co-chief executives. A second voting trust, known as the Ferd S. Meyer Puerto Rican Trust was created to hold the shares originally issued to Florida Cane Products Corporation. Although this latter voting trust expired in 1955, the trustee, Ferd S. Meyer, refused to assent to its termination.

Another complicating factor in the situation of the debtor was the proceeding commenced in this court in 1946 by one R. E. Peckham, (R. E. Peckham, Assignee, etc., plaintiff vs. Ronrico Corporation et al., defendants, Civil Number 4639) who alleged that he was the assignee for the creditors of the Meyer-Kiser Bank, and contended in effect that the money which the Florida Cane Products Corporation had used originally to acquire a one-half interest in Ronrico Corporation was money belonging to the creditors of the Meyer-Kiser Bank of Indianapolis.

Subsequently, R. E. Peckham intervened in his original suit in another capacity, claiming to be the trustee holder of a judgment assigned to him from the Liquidation of the Meyer-Kiser Bank of Miami. In his intervention, Peckham made an alternative attack upon a part of the shares of Ronrico originally issued to Florida Cane Products Corporation, claiming in essence that the interest of Ferd S. Meyer in the Ferd S. Meyer Puerto Rican Trust (and hence his interest in common shares of Ronrico) should properly be applied to the payment of the judgment rendered against Meyer and in favor of the Meyer-Kiser Bank of Miami.

The complaint in the original Peckham suit was filed on May 20, 1946, and the intervening claim was first filed on July 21, 1947, and again filed on March 9, 1949. For the purposes of this proceeding, the merits of the claims of Peckham in the companion litigation are not material. However, the existence of the Peckham litigation, and the inability of the parties to conclude it for a period of about 12 years, has left the debtor corporation in a difficult position, in that the debtor in its efforts to refinance itself, has never been able to determine whether it should, or could, properly deal with Meyer and his group as the owners of a substantial block of its stock.

Under these circumstances, there was some question as to whether any plan of reorganization of the debtor could be devised which would be feasible, and which would at the same time be fair and equitable to the interested parties, and the court has given serious consideration as to whether it might not be to the best interests of the stockholders of the debtor, including Peckham, if the court should make use of the discretionary powers which it has under the provisions of Section 236(2) of the Bankruptcy Act, 11 U.S.C.A. § 636(2), to enter an order adjudging the debtor a bankrupt.

The court has, however, concluded that an order adjudging the debtor a bankrupt would be contrary to the best interest of the creditors and stockholders, and that a plan of reorganization should be approved if one could be devised which would be fair, equitable and feasible.

From the history of the debtor, from the report of the appraisers, and from the operations of the debtor's business by the Trustee, it is apparent that future profitable operations of the debtor's business is at best speculative. It is also apparent from these same sources that the debtor has no chance of subsisting alone, in the sense that the debtor has at all times since its inception relied upon Distilling for the production of its products and in other material ways. A separation of the debtor from Puerto Rico Distilling Company would seem to be impracticable from a business standpoint.

It would thus seem to follow that any plan of reorganization to be feasible, must provide for a continuance of the relationship between the debtor and its source of supply, namely, Puerto Rico Distilling Company. For other reasons, which will presently appear, the exact relationship between Distilling and a reorganized debtor, is a matter which should be left to the discretion of Distilling.

Because of the speculative nature of the debtor's business, it would seem that no plan of reorganization would be fair and equitable to the creditors and stockholders of the debtor other than Puerto Rico Distilling Company which would not provide for the payment of all creditors in full, and for the realization by such stockholders of the present value of their interests in the debtor. Similar reasoning applies to the interest of Distilling in the reorganized company. Neither this court, nor any other court, can by any plan of reorganization, give to Distilling anything more than a fair chance to recover its claims against the debtor, now amounting to more than $500,000. The balance sheet of the debtor, as of July 31, 1957, which is contained in the report of the appraisers, shows a deficit in the stockholders' equity in the debtor of about $300,000, which has undoubted-

ly been increased since that time. The appraisers, by projecting assumed earnings over a period of years, have, for the purposes of their appraisal, eliminated this deficit, and have come up with a stockholders' equity of $52,937. This is predicated, however, upon the integrated operation of the debtor, Distilling, and the distributor of the debtor's products. Such an integration is, of course, beyond the power of this court. The most that this court can do is to place the interested parties in such a position that they can effect such an integration if they see fit.

No question has been raised as to the desirability of paying all creditors, other than Puerto Rico Distilling Company, in full; and the plan which is now before the court for approval, expressly so provides.

On April 28, 1957, Distilling and Meyer entered into an agreement (herein called the "Meyer Agreement") under which Meyer and his group agreed to sell, and Distilling agreed to buy, the preferred and common stock held by Meyer and his group, for an aggregate price of $244,000, of which $99,000 was assigned to the common shares, and the remainder of $145,000 was assigned to the preferred shares. The agreement contains other provisions, among which is one providing that it is subject to the approval of this court.

The Meyer Agreement, as written, cannot be approved as a whole by the court, since the Meyer Agreement fails to take into consideration the claims of R. E. Peckham, and contains other provisions which seem to invade the discretionary powers of the court. Insofar as the court is concerned, the Meyer Agreement will be accepted as stating a value, which the Meyer group and Distilling both accept, for the shares of preferred and common stock of the debtor now held by the Meyer group. The plan of reorganization which is now before the court so provides. The Meyer Agreement seems to have been reached by fair negotiation between the interested parties, and there appears to be no reason to disregard it.

Failure to accept the valuation placed by Distilling and Meyer on the Meyer shares would leave the court with no recourse other than to turn to the valuation placed upon these same shares by the report of the appraisers, which would be distinctly disadvantageous to Meyer, and consequently to Peckham. The Meyer Agreement, by valuing the preferred and common shares now held by Meyer, in effect places a valuation of $590,000 upon the stockholders' equity in the debtor, while the report of the appraisers reaches a figure of $52,937.

The court will disregard so much of the Meyer Agreement as purports to dispose of the funds which will be deposited in this proceeding pursuant to the Meyer Agreement, to the extent that the interests of Peckham may be adversely affected thereby.

In the opinion of the court, the plan, as drafted by the Trustee, affords adequate protection for the realization by the Meyer group of stockholders of their equity in the property of the debtor.

The interest of R. E. Peckham in these proceedings presents a more difficult problem. It should be borne in mind that Peckham has presented himself to this court as a trustee, both for the creditors of the Meyer-Kiser Bank of Indianapolis, and, in his intervening claim, as Trustee holder of a judgment entered on behalf of the Liquidator of the Meyer-Kiser Bank of Miami against Ferd S. Meyer, in the Circuit Court of the Eleventh Judicial Circuit of Florida, in and for the County of Dade. In a document filed herein entitled "Peckham's Response Concerning Sections 210 and 211", Jay E. Darlington, in his capacity as attorney for Peckham, has stated under oath that "Peckham does not have and never has had any beneficial interest in either of these judgments".

It accordingly follows that Peckham is, and must be treated as, a fiduciary, and that this court, sitting as a court of equity, must consider and determine whether the proposed plan of reorganization fairly and equitably deals with the

beneficiaries of the two trusts, and need not necessarily be swayed by the desires either of Peckham or of his counsel, if in the judgment of the court the course proposed by Peckham or his counsel would fail to give the beneficiaries of the two trusts at least as much protection for the realization by them of the value of their contingent equity, if any, in the property of the debtor, as is given to the Meyer group.

There are a limited number of alternatives available for the protection of the contingent equity, if any, of the beneficiaries of the two Peckham trusts.

One alternative, which has been urged by counsel of Peckham, is the dismissal of these proceedings. On this point, there is an apparent conflict of interest between Peckham and his counsel and the beneficiaries of the two trusts. Mr. Darlington, Peckham's counsel, stated in the document entitled "Peckham's Response Concerning Sections 210 and 211", that Darlington "was employed by a written contingent attorney fee contract between Peckham, assignee, and the affiant (Darlington), prior to the commencement of Civil No. 4639". It is obvious that a court of equity cannot give consideration to such an interest, but will rather seek the best interests of the ultimate beneficiaries of the Peckham trusts.

It is apparent that a dismissal of the proceedings would be at best a gambler's solution, since the debtor corporation is now without working capital, and must depend (as it has depended for the last 10 years) upon Distilling if it is to survive at all. Very substantial sums of money must be invested in the debtor if it is eventually to become profitable. In case of a dismissal, the court would have no power to assure itself that such sums of money would be invested, or to control in any way the form and manner of such investment, if any should be made.

Various avenues would be open to Puerto Rico Distilling Company if no plan of reorganization should be approved. The most obvious would be to insist upon an adjudication in bankruptcy under section 236 of the Bankruptcy Act. Another would be to supply the debtor corporation with funds by the purchase of common stock. Since it has been determined by the appraisal that the present common stock is without value, there would be no reason why Distilling should not in such case re-finance the debtor corporation so as to freeze out the minority interest upon which Peckham claims a lien.

An adjudication in bankruptcy would be ruinous, to all parties concerned. In view of the appraiser's report, the existing capital deficit and the resulting stoppage of business the estate would lose its going concern value, the properties would have to be sold at a fair upset price, the trade marks, trade name and good will, if any, would probably become worthless and in all probability, no equity would be available to the preferred and common stock, and, the Peckham beneficiaries would have nothing upon which to exercise their claimed equitable lien upon the stock owned by the Meyer group in the debtor corporation.

There are probably other solutions which Distilling might find to the problem. It is quite obvious from the course of these proceedings that Distilling would not willingly continue as Peckham's partner in any enterprise. It is not necessary or feasible for the purposes of this opinion to speculate as to how such a relationship would be terminated. It is sufficient to say that a dismissal of these proceedings would not carry any assurance that the beneficiaries of the two Peckham trusts would receive anything out of the shares of stock of the debtor upon which they now claim a lien.

On the other hand, a dismissal of these proceedings would be distinctly unfair to Distilling. As is evidenced by the Trustee's report under Section 167 of the Bankruptcy Act, 11 U.S.C.A. § 567, which was approved by order entered herein on May 3, 1957, the Trustee has found no evidence of fraud, mismanagement, misconduct, or irregularity in the conduct of the debtor's business by Dis-

tilling. If guilty of anything, Puerto Rico Distilling Company has been guilty of an excess of zeal in its efforts to keep the debtor afloat for the past 11 years. The history of the debtor indicates that Distilling would have been in a much more advantageous position if it had not attempted to support the debtor; and that the Meyer group, and consequently the Peckham beneficiaries, would have had nothing to litigate over if Distilling had withdrawn its financial support from the debtor in 1947, as it might have or if Distilling had awaited the report of the appraisers before making the Meyer Agreement.

Notwithstanding these facts, which should have been apparent both to Meyer and Peckham, both have asserted claims of fraud, mismanagement, misconduct, and irregularity in the conduct of the business of the debtor by Distilling. Meyer in fact precipitated these proceedings by the commencement of an action in the Chancery Court in Delaware; and Peckham, through his counsel Darlington, and notwithstanding the report of the Trustee under Section 167 of the Bankruptcy Act, and the order of May 3, 1957 approving the Trustee's Report, has persistently reiterated the same charges.

There is nothing in the record in these proceedings, nor anything in the report of the Trustee under Section 167, or otherwise presented to the court, which would indicate any ground for penalizing Distilling, or affording any ground which Distilling should not receive from these proceedings such opportunity as the court can give it, for the eventual realization of the substantial sums of money which Distilling has invested in, and must later invest in, the debtor, if it is to recover its present investment. Similarly, there is no reason why Distilling should in the future be menaced by suits and proceedings which can be fairly and equitably settled in these proceedings.

The same considerations which make a dismissal of these proceedings undesirable, are applicable to any plan of reorganization which would permit Peckham or the beneficiaries of the Peckham trusts to retain any interest in, or lien upon, the stock of the debtor. Any effort upon the part of Peckham to retain such an interest or lien in a plan of reorganization is as much a gambler's solution of his problem, as would be a dismissal. The problem of financing the debtor's continuing business remains unchanged, and the interest of the Peckham beneficiaries would still remain subject to the risks of the business. If the business of the reorganized debtor should be successful, and Peckham should succeed in establishing his claim to the shares, or any part of them, formerly belonging to the Meyer group, Peckham would in such event seem to have obtained a windfall. All risks of the reorganized corporation would be upon Distilling. Neither Peckham nor his beneficiaries would, or could, participate in the financing or the management of the reorganized corporation. Should the business of the reorganized corporation, so managed and financed, be unsuccessful, it is not improbable that Distilling would eventually be faced with a stockholder's suit by Peckham or his beneficiaries. Even an unsuccessful suit of this kind would be expensive, troublesome, and embarrassing to Distilling, and the risk of such an action would tend to hamper and hinder the rehabilitation of the debtor.

It is unlikely that Distilling would accept such a risk, and it would be unfair and inequitable to ask it to do so. It is the opinion of the Court that any plan of reorganization which would perpetuate, even in part, the situation which led to these proceedings, and which would subject Distilling to the risk of a repetition of the circumstances giving rise to these proceedings, would be unfair and inequitable, and in all likelihood, not feasible.

The court is accordingly of the opinion that the plan, as submitted by the Trustee, is fair, equitable and feasible and an order approving the same shall be entered.